UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAJED SUBH,** | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 10-0725 (RMC) |
| **CENTRAL INTELLIGENCE AGENCY,** | ) |
| Defendant. | ) |

MEMORANDUM OPINION

Plaintiff brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a, against the Central Intelligence Agency ("CIA"). This matter is currently before the Court on the CIA's motion for summary judgment. For the reasons discussed below, the motion will be granted.

I.  FACTS

In March 2009, Plaintiff submitted a request to the United States Army ("Army"), Intelligence and Security Command ("INSCOM") for "information for the reason and cause of the INSCOM declination of potential employment determination by [Global Linguist Solutions ("GLS")]." Mem. of Points and Authorities in Support of Defendant's Mot. for Summ. J. ("Def.'s Mem.") [Dkt. # 8], Attach. 1 ("Sleeper Decl."), Ex. A (FOIA Request dated March 3, 2009).[1]  A

---

[1]  Plaintiff describes himself as "a linguist, interpreter, translator and culture advisor candidate for the U.S. Army." Plaintiff['s] Response to Defendant's Mot. for Summ. J. ("Pl.'s Opp'n") [Dkt. # 12] at 1. It appears that plaintiff sought employment with a company called Global Linguist Solutions, and that he was denied employment because of the results of the intelligence checks conducted by the FBI and the CIA. *See id*. He requests records under the
(continued...)

1

search of the Defense Central Index of Investigations ("DCII") yielded an Army intelligence investigative record pertaining to Plaintiff, and a search of the Joint Personnel Adjudication System ("JPAS") yielded no responsive records. Sleeper Decl. ¶ 7. On April 16, 2009, the Army released to Plaintiff 128 pages of records after having withheld certain information concerning a third party under FOIA Exemption 6. *Id.* ¶ 8; *see id.*, Ex. D (Letter to Plaintiff from S.J. Butterfield, Director, Freedom of Information/Privacy Office, Investigative Records Repository, INSCOM, dated April 16, 2009).

Among the responsive records was a "one-page document entitled CI/FP Intelligence Checks," described as a "Counterintelligence and Force Protection Check worksheet that documents intelligence checks such as DCII, JPAS and Fingerprints, as well as the date and results of Agency record checks such as [Federal Bureau of Investigation ("FBI")] and CIA checks." *Id.* ¶ 9. The Army referred this document to both the FBI and the CIA. *Id.* ¶¶ 10-11; *see id.*, Ex. E (Memoranda from S.J. Butterfield to the FBI and the CIA dated May 27, 2009).

The FBI authorized release of the document in its entirety. Sleeper Decl. ¶ 14; *see id.*, Ex. H (Memorandum from David M. Hardy, Record/Information Dissemination Section, Records Management Division, FBI, dated June 24, 2009). The CIA, however, authorized the

---

[1](...continued)
FOIA and the Privacy Act in order "to find why [he] was ceased as a linguist, interpreter, translator and culture advisor and which info led to his cease of his hiring," so that he "will be able to discuss the accuracy of this info and correct it to be able to be hired again. *Id.* at 3; Plaintiff Response to Defendant's Reply to the Mot. for Summ. J. ("Pl.'s Surreply") [Dkt. # 16] at 1. Plaintiff's formal complaint of employment discrimination based on his race, color, national origin, religion, and reprisal "when on or around March 2010 [he was] labeled a security risk by the 902nd Screening which cost [him] a position with Global Linguist Solutions (GLS)," Pl.'s Opp'n, Ex. 2 (Letter to plaintiff from the Army's Equal Employment Opportunity Office dated June 21, 2010), is pending.

release of the document "in segregable form with deletions made on the basis of FOIA exemptions (b)(3) and [Privacy Act] exemption (j)(1)." *Id.*, ¶ 13; *see id.*, Ex. G (Letter from D.M. Nelson to Freedom of Information and Privacy Office, INSCOM, dated June 17, 2009). The Army in turn released the redacted document to Plaintiff. *See id.*, Ex. I (Letter to Plaintiff from S.J. Butterfield dated June 30, 2009 with attachments). Plaintiff filed an appeal of these decisions to the Army's Freedom of Information and Privacy Division, Privacy Review Board, and the appeal was denied. *Id.* ¶¶ 17-18; *see id.*, Ex. K-L (Letter from Plaintiff to the Privacy Act Review Board and Letter to Plaintiff from Steven A. Raho, III, Chairman, Department of the Army Privacy Review Board, dated December 18, 2009, respectively).

In addition, Plaintiff sent a letter to the CIA appealing its "withholding in order to release all of his documents in detail." Def.'s Mem., Attach. 2 ("DiMaio Decl."), Ex. B (Letter from Plaintiff to Delores M. Nelson, Information & Privacy Coordinator, CIA). The CIA's Agency Release Panel ("ARP") reviewed Plaintiff's appeal "and determined that the redacted portions . . . must continue to be withheld on the basis of FOIA exemption (b)(3) and [Privacy Act] exemption (j)(1)." DiMaio Decl., Ex. D (Letter from D.M. Nelson to Plaintiff dated September 14, 2009). Plaintiff now seeks judicial review of the ARP's decision. *See* Compl. [Dkt. # 1].

## II. DISCUSSION

### A. Summary Judgment in a FOIA Case

"A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a). The Court generally should render the judgment sought "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

3

to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on an element of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits his own affidavits, declarations or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

In a FOIA case, the Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations if they are relatively detailed and when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Cent. Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)).[2]

---

[2] The CIA's declarant is the Information Review Officer ("IRO") for the CIA's National Clandestine Service ("NCS"). DiMaio Decl. ¶ 1. In this capacity, the declarant is "authorized to assess the current, proper classification of CIA information under Executive Order 12958, as amended, and applicable CIA regulations," and he is "responsible for the classification
(continued...)

### B. Exemption 3

As stated above, the one-page document at issue is entitled "CI/FP Intelligence Checks," and contained a Counterintelligence and Force Protection Check worksheet documenting intelligence checks on Plaintiff by the FBI and the CIA. Sleeper Decl. ¶ 9; DiMaio Decl. ¶ 21. The CIA acknowledges the fact that it conducted an intelligence check on Plaintiff, and redacts only the result, *see* Sleeper Decl., Ex. I, described as information "pertaining to CIA intelligence methods and functions," on the ground that it "is exempt from disclosure under FOIA exemption (b)(3) and [Privacy Act] exemption (j)(1)." DiMaio Decl. ¶ 18.

Exemption 3 protects records that are "specifically exempted from disclosure by statute . . . if that statute . . . requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A).[3] "Exemption 3 differs from

---

[2](...continued)
review of documents and information originated by the NCS or otherwise implicating NCS interests, including documents which may be the subject of court proceedings or public requests for information under the [FOIA]." *Id.* ¶ 3. A principal objective in this regard is to "ensure that any determinations as to the public release or withholding of . . . documents or information . . . do not jeopardize the national security by disclosing classified NCS intelligence methods, operational targets, or activities, and do[] not endanger NCS personnel, facilities, or sources." *Id.*

[3] The FOIA and the Privacy Act necessarily work together. No agency may rely on a FOIA exemption to withhold from an individual any record which otherwise is accessible to him under the Privacy Act, 5 U.S.C. § 552a(t)(1), and conversely, no agency may rely on a Privacy Act exemption to withhold any record which otherwise is accessible to that individual under the FOIA, 5 U.S.C. § 552a(t)(2). In this case, the CIA relies both on Exemption 3 and on regulations which exempt CIA systems of records from subsections (d) and (g) of the Privacy Act. 5 U.S.C. § 552a(j)(1); 32 C.F.R. § 1901.62(d)(1) and (e)(1). To the extent that disclosure of information deemed a "record" for Privacy Act purposes is permitted under the FOIA, however, the Privacy Act allows its release. *See* 5 U.S.C. § 552a(t)(2).

other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 350 (D.C. Cir. 1978); *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). In other words, the CIA "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. Dep't of State*, 565 F.3d 857, 868 (D.C. Cir. 2009) (citing *Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 761–62 (D.C. Cir. 1990)).

Two statutes are relevant to this discussion. First, pursuant to the National Security Act of 1947 ("NSA"), the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1).[4] The CIA construes the NSA as a federal statute requiring that "matters be withheld from the public in such a manner as to leave no discretion on the issue." DiMaio Decl. ¶ 15 (quoting 5 U.S.C. § 552(b)(3)(A)). Second, Section 6 of the Central Intelligence Agency Act of 1949 ("CIA Act") exempts the CIA from "any . . . law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the [CIA]." 50 U.S.C. § 403g. The CIA Act, the declarant asserts, "establishes particular criteria for withholding or refers to particular types of matters to be withheld, " DiMaio Decl. ¶ 16 (quoting 5 U.S.C. § 552(b)(3)(B)), and thus absolutely protects information regarding the CIA's organization, functions, names, official titles, salaries, and numbers of personnel employed, *id*.

---

[4] The Director of National Intelligence has assumed the duties previously delegated to the Director of Central Intelligence. *See Wolf v. Cent. Intelligence Agency*, 473 F.3d 370, 377 n.6 (D.C. Cir. 2007).

"It is well established that these provisions of the [NSA] and the [CIA] Act are 'precisely the type of statutes comprehended by exemption 3.'" *Schoenman v. Fed. Bureau of Investigation*, No. 04-2202, 2009 WL 763065, at *24 (D.D.C. Mar. 19, 2009) (quoting *Goland*, 607 F.2d at 349) (other citations omitted)); *see Cent. Intelligence Agency v. Sims*, 471 U.S. 159, 167 (1985) (recognizing that the NSA qualifies as a withholding statute under Exemption 3 "because it refers to particular types of matters that are to be withheld" (internal quotation marks and citations omitted)); *Valfells v. Cent. Intelligence Agency*, No. 09-1363, 2010 WL 2428034, at *3 (D.D.C. June 17, 2010) (noting that the NSA and the CIA Act "have been recognized as exempting statutes for the purposes of Exemption 3").[5]

The CIA's declarant explains that "[c]landestine intelligence activities lie at the core of the CIA's functions," and that "intelligence methods are the means by which the CIA accomplishes [this] core . . . function." DiMaio Decl. ¶ 19. Because "[i]ntelligence methods are

---

[5] As "a corollary to FOIA exemption (b)(3)," DiMaio Decl. ¶ 17, the CIA relies on the Privacy Act, which authorizes an agency head to promulgate regulations to exempt a system of records from certain provisions of the Privacy Act, including subsections (d) and (g), if the system of records is maintained by the CIA. 5 U.S.C. § 552a(j)(1). Pursuant to this authority, the Director of Central Intelligence has exempted from access by individuals under 5 U.S.C. § 552a(d) all systems of records maintained by the CIA that:

> (1) Consist of, pertain to, or would otherwise reveal intelligence sources and methods;
> (2) Consist of documents or information provided by any foreign government entity, international organization, or, any United States federal, state, or other public agency or authority; and
> (3) Consist of information which would reveal the identification of persons who provide information to the CIA Inspector General.

32 C.F.R. § 1901.62(d).

effective only so long as they remain unknown," the CIA "protects its methods from disclosure to prevent any assistance to those who would seek to damage the intelligence operations of the United States." *Id.* ¶ 20. Although the CIA acknowledges that it conducts intelligence checks on individuals, it refuses to release their results because such disclosure "would reveal exempt information relating to intelligence methods and CIA functions." *Id.* ¶ 21.

By releasing the results of an intelligence check, the CIA contends that it necessarily reveals either "the existence or non-existence of a CIA interest in the individual or . . . the scope or effectiveness of the intelligence methods used by [the] CIA to collect information or to reach conclusions about an individual." *Id.* Its declarant explains:

> If the CIA acknowledged it did not have information on a specific individual who was the subject of an intelligence check, it would reveal CIA intelligence methods in two ways. First, the absence of information would acknowledge a lack of CIA interest or capabilities in gathering such intelligence on the individual. Second, if the CIA were to release only the results of intelligence checks which located no information relating to the subject of the agency check, this would implicitly reveal that when the CIA redacts the results of other agency checks, it confirms that it has records on an individual and thus has an interest in the subject of that request. In essence, a "no records located" response would amount to an admission or confirmation of a lack of intelligence interest, where a redaction would indicate an interest.

*Id.* ¶ 22. Mindful that "[f]oreign intelligence services and others who have interests opposed to those of the United States search constantly for officially released intelligence information," gather information "from a myriad of sources," analyze the information, and "deduce means to defeat CIA intelligence methods from seemingly disparate and unimportant details," *id.* ¶ 19, "the only way the CIA can protect its ability to maintain clandestine intelligence interests in specific individuals without officially confirming or denying such interests is to withhold the results of Agency checks

8

on any specific person," *id.* ¶ 22. Otherwise, "foreign intelligence services or other hostile entities" could determine "which intelligence operatives or types of intelligence activities the CIA can and cannot monitor, . . . how it performs this monitoring . . . [and] which persons are potential CIA sources or individuals cooperating with the CIA." *Id.* ¶ 23. If foreign intelligence services were privy to this sort of information, they could "redirect resources to identify potential CIA sources, circumvent the CIA's monitoring efforts or defeat the use of particular methods, and greatly enhance their intelligence activities at the expense of the Untied States." *Id.* ¶ 24.

In summary, the CIA's declarant asserts that the agency's "covert intelligence interest in a specific individual represents an intelligence method that is core to the CIA's clandestine collection function." DiMaio Decl. ¶ 23. If the CIA were not allowed "to preserve the clandestine nature of its intelligence methods, [its] ability to perform its core function would be compromised." *Id.* ¶ 25.

Plaintiff counters that the CIA is "able to release the info related to . . . [P]laintiff and at the same time block their methods and functions." Pl.'s Surreply at 1; *see* Pl.'s Opp'n at 2. He explains that his purpose in bringing this action is to obtain information provided by the CIA to INSCOM "which led to stop his hiring as a linguist candidate for the [A]rmy," a position he "ha[d] been seeking . . . for 3 years with GLS." Pl.'s Surreply at 1. Plaintiff neither proposes how the CIA might accomplish this feat nor cites legal authority for this proposition.

The CIA's response is essentially a Glomar response. *See Phillippi v. Cent. Intelligence Agency,* 546 F.2d 1009, 1011 (D.C. Cir. 1976) (acknowledging the CIA's refusal to confirm or deny existence of records regarding the activities of a ship named *Hughes Glomar Explorer*). Such a response is "applicable in cases where to answer the FOIA inquiry would cause

harm cognizable under a[ ] FOIA exception – in other words, in cases in which the existence or nonexistence of a record is a fact exempt from disclosure under a FOIA exception." *Wilner v. Nat' Sec. Agency*, 592 F.3d 60, 70 (2d Cir. 2009) (quoting *Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1103 (D.C. Cir. 1982) (internal quotation marks omitted), *cert. denied*, 131 S. Ct. 387 (2010); *Wolf*, 473 F.3d at 374. "When the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Phillippi*, 546 F.2d at 1013.

The CIA's declarant establishes that any further response to Plaintiff's FOIA request would reveal agency sources or methods. If the CIA were to state that it had no information pertaining to Plaintiff, it would indicate either than it has no interest in him or is incapable of acquiring information about him. "In essence, a 'no records located' response would amount to an admission or confirmation of a lack of intelligence interest, where a redaction would indicate an interest." DiMaio Decl. ¶ 22.

Although the release of the information Plaintiff requests may appear to pertain only to his application for employment, it may have greater significance. The Court is mindful that "each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself." *Fitzgibbon*, 911 F.2d at 763 (quoting *Gardels*, 689 F.2d at 1106 ). The CIA establishes that any further response to Plaintiff's FOIA request would result in disclosure of whether it has an intelligence interest in Plaintiff, which, in light of the CIA's covert intelligence responsibilities, would amount to the disclosure of an intelligence method. The CIA's response in this case is appropriate. *See Bassiouni v. Cent. Intelligence Agency*, 392 F.3d 244, 245 (7th Cir. 2004)

(affirming a Glomar response to a first-person request for CIA records on the ground that "providing a list of the documents that mention [the requester], and claiming document-by-document exemptions for those whose contents are classified, would reveal details about intelligence-gathering methods," even if "disclosure could be innocuous"); *People for the Am. Way Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 462 F. Supp. 2d 21, 31 (D.D.C. 2006) (concluding that the National Security Agency's Glomar response to a request for records related to surveillance of plaintiff was appropriate because confirmation that a person's activities are not of foreign intelligence interest or that the NSA was unable to collect foreign intelligence information on his activities "would allow our adversaries to accumulate information and draw conclusions about NSA's technical capabilities, sources, and methods"); *see also Wolf*, 473 F.3d at 376 (concluding that revealing the existence of CIA records "regarding specific foreign nationals could potentially reveal targets of CIA surveillance and, thus, CIA methods" by "signal[ing] to a foreign intelligence service the specific persons and areas in which the CIA is interested and upon which it focuses its methods and resources").

### III.  CONCLUSION

The CIA has demonstrated its compliance with the FOIA and that it is entitled to judgment as a matter of law. Accordingly, the Court will grant summary judgment for Defendant. A memorializing Order accompanies this Memorandum Opinion.


Date: January 19, 2011                                         /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge